Andrew M. Calamari
Lara S. Mehraban
Sandeep Satwalekar
Alexander Janghorbani
Andrew Dean
Lindsay S. Moilanen
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1100

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : 16 Civ. _____ ( ) |
| Plaintiff, | : ECF CASE |
| - against - | : COMPLAINT |
| MARC D. BROIDY and BROIDY WEALTH ADVISORS, LLC, | : JURY TRIAL : DEMANDED |
| Defendants. | |

---

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Marc D. Broidy ("Broidy") and Broidy Wealth Advisors, LLC ("BWA", and together with Broidy, "Defendants"), alleges as follows:

## SUMMARY

1. Defendants—an investment adviser and its sole owner and principal—defrauded their advisory clients through three separate schemes.

2. First, from at least February 2011 to July 2016, Defendants intentionally overbilled clients and used the excess fees to pay for, among other things, Broidy's personal expenses, including his home mortgage, trips overseas, and lease payments on two new

Mercedes-Benz vehicles.

3. Pursuant to the terms set forth in BWA's Form ADV and its Investment Advisory Contracts with clients, BWA's clients should have been charged an annual fee, ranging from 1% to 1.5% of their assets under management, billed on a quarterly basis. Instead, Broidy billed them at much higher rates, resulting in overbilling of advisory fees of approximately $643,000.

4. Broidy covered up his overbilling scheme by altering the management fees reported on Forms 1099 issued by brokerage firms before sending those forms to clients or their accountants. Broidy also sent one of BWA's brokerage firms a number of false and misleading documents in an attempt to cover up his overbilling.

5. Second, from April 2015 to February 2016, Broidy misappropriated $865,318 in assets from trusts for which he was trustee, again using the funds to pay for personal expenses.

6. To cover up his personal use of the trusts' assets, Broidy purported to sell to the trusts shares that he personally owned in two privately-held, risky, start-up companies. However, Broidy never transferred these shares to the trusts.

7. Finally, Broidy made material misrepresentations and omissions to advisory clients regarding their investments in privately-held companies with which he was affiliated. Specifically, he omitted information about the financial and operational status of those companies, his compensation for soliciting investments, and his role as a board member of those companies.

## VIOLATIONS

8. By engaging in the conduct set forth in this Complaint, Defendants Broidy and BWA have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; Section 10(b) of the Securities Exchange

Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)]; Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)]; and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

10. The Commission seeks a final judgment: (a) restraining and permanently enjoining Defendants from engaging in the acts, practices, and courses of business alleged against them herein and from committing future violations of the above provisions of the federal securities laws; (b) ordering Defendants to disgorge any ill-gotten gains they received and to pay prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; (d) barring Defendant Broidy from serving as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and (e) ordering such other and further relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), 20(e), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77t(e), and 77v(a)]; Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa]; and Sections

209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), and 80b-14].

12. Venue is proper in the Eastern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)]; Section 27 of the Exchange Act [15 U.S.C. § 78aa]; and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Certain transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Eastern District of New York. For instance, Defendants obtained access to the trusts' shares through a transfer agent located in Brooklyn, New York and also made false and misleading statements to a client regarding her investment in a company with its principal place of business in Queens, New York (CableCo, described in more detail below).

13. Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, of the mails and wires, and/or of the facilities of a national securities exchange in connection with transactions, acts, practices, and courses of business alleged herein.

## DEFENDANTS

14. **BWA,** which has been registered as an investment adviser in New York and California since December 13, 2010 and January 3, 2011, respectively, is engaged in the business of providing advice regarding securities for compensation. It was initially headquartered in East Aurora, New York, and is currently headquartered in Beverly Hills, California. Broidy is the principal and only member of BWA and makes all investment recommendations on its behalf. From November 2010 to late 2015, Broidy (through BWA) provided investment advisory services to approximately 12 to 15 clients. For the past several years, BWA's Form ADV reflected assets under management of just over $25 million. However, in its most recent Form ADV, filed in February 2016, BWA disclosed that its AUM had dropped to approximately $13.7

4

million.

15. **Broidy**, age 43, is a resident of Beverly Hills, California, and is the managing member, chief compliance officer, and sole owner of BWA. Broidy held Series 7, 9, 10, 63, and 66 licenses until approximately 2013. Broidy has been registered in California as an investment adviser representative since he began BWA.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

16. **Client A**, age 65, is a resident of Santa Monica, California. Client A used Broidy as an investment adviser for accounts for himself and his wife for over fifteen years until approximately April 2016.

17. **Clients B and C**, ages 62 and 53, are a married couple who reside in Beverly Hills, California. Client B is the co-founder of a publicly-traded biotechnology company ("PubCo"). Client C is the president and CEO of PubCo. Clients B and C used Broidy as an investment adviser from approximately 2011 through April 2016.

18. **Clients D and E**, ages 45 and 42, are a married couple who reside in Sherman Oaks, California. Clients D and E used Broidy as an investment adviser from approximately 2006 through August 2015.

19. **Bandwidth Technologies Corp. ("Bandwidth")** is a privately-held company incorporated in Delaware with its principal place of business in New York. Broidy was a board member of Bandwidth from 2010 to 2013, and he encouraged multiple clients to invest in the company. Bandwidth entered into Chapter 7 bankruptcy proceedings in the Southern District of New York in May 2015.

20. **Cable Technology Company ("CableCo")**, a privately-held start-up incorporated in Delaware with its principal place of business in Queens, New York, is focused

5

on acquiring intellectual property assets related to broadband technology. Broidy helped found this company and served on its board from approximately January to December 2015.

21. **Jet Charter Company, Inc. ("JetCo")**, a privately-held start-up incorporated in New Jersey with its principal place of business in New Jersey, is focused on brokering charter aircraft flights. Broidy served on its board from approximately July 2013 to April 2016.

## FACTS

### I. DEFENDANTS' OVERBILLING SCHEME

22. From at least February 2011 to February 2016, Defendants overbilled Clients A through E by a total of approximately $643,000, and took steps to hide the overbilling scheme.

23. BWA entered into agreements with its clients entitled Investment Advisory Contracts in which BWA was appointed as an investment adviser. BWA's Form ADV and Investment Advisory Contracts disclosed that clients were billed a certain percentage of their assets under management ("AUM") on a quarterly basis based on the following chart:

| Total AUM | Annual Fee |
| --- | --- |
| $1 - $1,000,000 | 1.50% |
| $1,000,001 - $2,000,000 | 1.25% |
| $2,000,001 - $5,000,000 | 1.00% |
| Above $5,000,000 | Negotiable |

#### A. Client A

24. From February 2011 to March 2016, Defendants managed, on average, at least $2 million in assets for Client A. In accordance with BWA's written disclosures, Defendants told Client A that they would charge him a 1% annual fee, which would be deducted from one of his accounts on a quarterly basis. From February 2011 to March 2016, Defendants overcharged Client A by approximately $213,273.

**B.  Clients B & C**

25. From March 2011 to March 2016, Defendants managed, on average, at least $2 million in assets for Clients B and C. Through the Form ADV, the advisory agreement, and Broidy's oral statements to Clients B and C, Defendants communicated to Clients B and C that they would be charged a 1% annual fee, deducted on a quarterly basis. From March 2011 to March 2016, Clients B and C were overcharged approximately $190,874. In addition, in July 2016—after Clients B and C had terminated their relationship with him—Broidy deducted $6,000 in advisory fees from one of Clients B and C's brokerage accounts.

**C.  Clients D & E**

26. From April 2011 to August 2015, Defendants managed approximately $2 million in assets for Clients D and E. Defendants told Clients D and E that they would be charged a 1.5% annual fee, deducted on a quarterly basis. From April 2011 to August 2015, Clients D and E were overcharged approximately $239,000 based on their own calculation.

27. After noticing a lower account balance than anticipated, Clients D and E examined their brokerage statements in more detail and found higher than expected fee deductions. They confronted Broidy about this in person. He denied there was an issue and falsely claimed that any error was the brokerage firm's fault.

28. Ultimately, Clients D and E reached a settlement pursuant to which Broidy paid them $325,000.

**D.  BWA's Brokerage Firm Severs Ties with Defendants.**

29. In April 2013, BWA's broker-dealer ("Broker-Dealer A") contacted Broidy to inquire about an increase in fees for Client A's accounts. Broidy pointed Broker-Dealer A to an "outside asset letter," dated March 11, 2013, purportedly signed by Client A, which indicated

7

that Defendants were billing for advising on assets held outside of Broker-Dealer A. This statement was false and misleading because at that time, Defendants only managed one asset outside of the brokerage account for Client A, and the appropriate advisory fees for this account should have been under $1,000 annually.

30. In July 2014, Broker-Dealer A again contacted Broidy to inquire about fluctuations in fee amounts and billing frequency in the accounts held by Clients B, C, D, and E. Broidy told Broker-Dealer A that the increased fees were due to (1) his providing advice on assets held outside of Broker-Dealer A; and (2) fees related to hourly billing for services outside of investment advisory services. However, as Broidy knew, should have known, or recklessly disregarded, these statements were also false and misleading. Although Broidy performed certain services for Clients B and C beyond investment advisory services, Broidy told Clients B and C that he would not charge them for additional services. Broidy also provided an invoice reflecting hourly services to Broker-Dealer A; neither this bill, nor any other bill for services, was ever sent to Clients B and C, who understood from Defendants these services were included in Defendants' 1% annual advisory fee.

31. By the end of August 2014, Broker-Dealer A terminated Defendants' ability to bill clients directly through its platform. In January 2015, Broker-Dealer A terminated its relationship with Defendants' entirely.

32. In or about October 2014—after Broker-Dealer A terminated Defendants' ability to collect fees through its platform—Defendants transferred their clients' assets to another broker-dealer ("Broker-Dealer B"). However, a year later, Broker-Dealer B also terminated its relationship with Defendants, and Defendants moved the accounts to yet another brokerage firm ("Broker-Dealer C").

8

E.  **Defendants Take Steps to Hide Their Overbilling.**

33.  To hide the overbilling scheme, Broidy altered the Forms 1099 that he sent to clients and clients' accountants in order to eliminate or decrease the advisory fees he had deducted from the accounts. Below is a chart comparing a sample of the Forms 1099 produced by the brokerage firms to the Forms 1099 for which Broidy either whited-out or manually cut and pasted a lower fee amount:

| Account | Tax Year | Fees on Original 1099 | Fees on Altered 1099 Sent by Broidy | Difference |
|---|---|---|---|---|
| Clients D and E Account ending 0325 | 2012 | $85,267.66 | $31,528.90 | $50,738.76 |
| Clients B and C Account ending 7079 | 2012 | $34,051.84 | $14,650.73 | $19,401.11 |
| Client A Account ending 8122 | 2013 | $3,742.05 | Fees whited-out | $3,742.05 |
| Client A Account ending 4795 | 2013 | $18,143.66 | Fees whited-out | $18,143.66 |
| Clients D and E Account ending 0325 | 2014 | $67,277.25 | $4,918.50 | $62,358.75 |
| Clients A Account ending 3543 | 2014 | $30,545.00 | Fees whited-out | $30,545.00 |
| Clients A Account ending 4795 | 2014 | $51,435.70 | $4,918.50 | $46,517.20 |
| **Total Amount Of Under-Reporting in Above Forms 1099** | | | | $231,446.53 |

34.  In a March 31, 2015 email, Client D and E's accountant pointed out to Broidy that Clients D and E "dropped off original copies of these [1099] forms, and on page 5 of 6 of the advisor fees on the hard copy they brought to me do not match the copy you e-mailed . . . It's a pretty big difference between the two . . ."

35.  Broidy responded: "We had this problem a prior year with [Broker-Dealer A]. The numbers I provided to you are CORRECT: . . . $4,918.50." He later clarified: "Not unlike a

9

couple of years ago, there was a batch error for some clients . . . it was random in nature. This was one of the reasons I make sure to review ALL my client's [sic] 1099's and another reason I moved to [Broker-Dealer B]." However, Broidy's statements to the accountant were untrue, as he knew, should have known, or recklessly disregarded. There was no batch error at Broker-Dealer A; the fees on the hard copy form provided to the accountant by Clients D and E were correct.

## II. THE TRUST ACCOUNTS SCHEME

### A. Defendants Misappropriate Assets from Certain Trusts.

36. Clients B and C set up separate trusts for each of their six children ("Trusts") and appointed Broidy as the trustee. The Trusts were funded solely with 318,321 shares of PubCo (the publicly-traded company founded and run by Clients B and C). The shares were allocated to the various Trusts in accordance with a trust agreement ("Trust Agreement"). According to the Trust Agreement, dated November 13, 2013, the stated purpose of the Trusts was to provide for the interest and benefit of the children of Clients B and C.

37. The Trust Agreement provided that, if Broidy were to sell the Trusts' PubCo shares, he was required to invest the Trusts' assets in those things that "persons of prudence . . . acquire for their own account." While the Trust Agreement provided Broidy with certain discretion over the investment of the Trusts' assets, it explicitly required him to obtain an "independent appraisal" if Broidy transacted with the Trusts for his own account in order to ensure that the prices charged were "not in excess of the fair market value."

38. Despite telling Clients B and C that he would not charge them any additional fees in connection with his work as trustee, Broidy billed Clients B and C's advisory account—and not the Trusts—for services he provided to the Trusts. Such billing was contrary to Broidy's

representations to Clients B and C, as he knew, should have known, or recklessly disregarded.

39.    In addition, Broidy told Clients B and C that he would not sell the Trusts' PubCo stock. However, from April through October 2015, he proceeded to do just that. He transferred 71,321 PubCo shares from the Trusts' brokerage accounts to the BWA's omnibus account and sold those shares for $352,778.[1] Broidy then wired the proceeds to BWA's bank account and used the funds to pay for personal credit cards and other expenses.

40.    For example, on July 28, 2015, the balance in BWA's Bank of America checking account was $3,022.49. From July 29, 2015 through September 1, 2015, the only deposits to the BWA Bank of America account was a total of over $200,000 of proceeds from Defendants' sales of the Trusts' PubCo stock. Broidy used the proceeds of these sales to pay over $150,000 in personal expenses:

      a. Over $49,000 to American Express for Broidy's personal credit card expenses;

      b. Over $49,000 to Barclaycard for Broidy's personal credit card expenses;

      c. Over $23,000 to Chase Bank for Broidy's personal credit card expenses;

      d. Over $7,000 to Citi Card for Broidy's personal credit card expenses;

      e. $4,000 to Broidy's then-wife;

      f. Over $9,400 to FNFG Credit Card for Broidy's personal credit card expenses;

      g. $652 to Lending Club to service a personal loan Broidy had taken out months earlier;

      h. $4,400 to Broidy's personal accounts;

      i. Over $1,200 to Mercedes-Benz Financial Services for leases on two cars;

      j. Over $360 for assorted personal expenses;

---

[1] In order to transfer the PubCo certificates into the brokerage account, Broidy initiated numerous communications with PubCo's transfer agent, American Stock Transfer, whose principal place of business is Brooklyn, New York.

11

  k. Cash withdrawals of $1,315; and

  l. Gas and electric bills.

41. During that same time, April through October 2015, Broidy also directly sold 49,000 shares from the Trusts' accounts at Broker-Dealer B. The proceeds from those sales were transferred to accounts held at Broker-Dealer C in the Trusts' beneficiaries' names.

42. On a May 22, 2015, Broidy received an email from the CFO of PubCo asking "so the trusts still hold the same holdings as before (including PIPE shares and previous shares held)?" Broidy replied, "For your purposes that is correct . . ." However, Broidy knew, should have known, or recklessly disregarded that this statement was untrue as he had begun selling the Trusts' PubCo shares a month before he sent that email.

43. From October 19, 2015 through February 22, 2016, Broidy sold an additional 83,900 PubCo shares directly from the Trusts' accounts at Broker-Dealer C and wired $512,540 to his personal bank account. Broidy also used these funds for personal expenses, including paying his settlement with Clients D and E on account of his overbilling.

44. Broidy knew, should have known, or recklessly disregarded that he was not allowed, by the terms of the Trust Agreement or his representations to Clients B and C, to sell the PubCo Shares and use the proceeds for his personal gain. Defendants never informed Clients B and C about their use of the Trusts' assets for personal gain.

45. In addition—by exercising control over the purchase and sale of the Trusts' securities and compensating themselves for that activity—Defendants acted as investment advisers to the Trusts.

### B. Defendants Took Steps to Cover Up Their Misappropriation.

46. In order to cover up the misappropriation, Broidy created the false appearance

that he was using the proceeds of the PubCo sales—not for his own benefit—but to have the Trusts purchase shares that Broidy personally owned in two privately-held companies, CableCo and JetCo. In truth, however, Broidy never transferred any of the shares of CableCo or JetCo to the Trusts. Moreover, as Broidy knew, should have known, or recklessly disregarded, such transfers, even if they had occurred, would have violated both the terms of the Trust Agreement and his fiduciary duty as an investment adviser as discussed below.

### 1. *CableCo*

47. In August 2015, four months after he began transferring the PubCo shares and the proceeds from their sales to the BWA account that he used for personal expenses, Broidy purportedly entered into a stock purchase agreement between himself and the Trusts (the "CableCo Agreement"). Pursuant to this agreement, Broidy purported to transfer 175,000 shares of CableCo to the Trusts for $350,000.

48. The CableCo Agreement, which Broidy signed both as seller and trustee, falsely stated that (1) CableCo "has assembled a proprietary technology"; (2) that CableCo "is the owner of all its unique multiplexing and bandwidth utilization enabling technologies, proprietary intellectual property and technology assets as set forth in its Patents . . . ."; (3) that CableCo "is the owner of all trademarks, trade names, trade name registrations and applications, patents and patent applications . . . used or held by the Company in connection with the Company's business"; and (4) that the company's "Technology and Intangible Rights are subject to no pending or threatened challenge."

49. However, at the time that Broidy invested the Trusts' assets in CableCo, the company had virtually no assets and no business operations. Based on his position at CableCo, Broidy knew, should have known, or recklessly disregarded that CableCo had virtually no assets.

13

Broidy was one of only two board members of CableCo, a private company incorporated months earlier in January 2015. Its bank account was opened shortly thereafter by Broidy and another individual. CableCo's goal was to purchase intellectual property assets relating to broadband technology from the bankrupt estate of Bandwidth, another company with which Broidy had been closely associated. As of the date of this filing, CableCo has not yet purchased those assets. Moreover, Broidy never actually transferred any of the CableCo shares that he purported to own to the Trusts.

### 2. *JetCo*

50. Starting in late 2013, Broidy served as the Chairman of JetCo. JetCo, a privately-held online jet chartering service, had limited operations and generated virtually no profit.

51. Broidy created a stock purchase agreement on October 1, 2015 between BWA and the Trusts, purporting to memorialize Broidy's sale of 80,000 shares of JetCo—that he claimed to personally own—to the Trusts for $400,000 (the "JetCo Agreement").

52. As with the CableCo fraud, however, Broidy never actually transferred these shares to the Trusts. Moreover, such a transfer was not possible as Broidy only owned approximately 73,000 JetCo shares. In addition, approximately 50,000 of those shares were restricted by agreement with the company and could not be resold absent certain circumstances, which did not occur.

53. Moreover, as Defendants knew, should have known, or recklessly disregarded (1) the purported sales of the CableCo and JetCo shares, at most, accounted for only $750,000 of the $865,318 in proceeds generated from the sales of PubCo shares that Broidy transferred from the Trusts to himself; (2) Defendants never obtained an independent valuation of the JetCo and CableCo shares they purported to sell to the Trusts as required by the Trust Agreement; and

(3) Defendants never disclosed the conflicts of interest they faced in purporting to sell shares that Broidy personally owned to his advisory clients, the Trusts.

### III.  ADDITIONAL MISREPRESENTATIONS AND OMISSIONS

54. Broidy made additional false and misleading statements to his clients relating to CableCo, JetCo, and Bandwidth while advising them to purchase interests in these companies.

55. First, in or about April 2015, Broidy recommended that an advisory client ("Client F") make a $25,000 investment in CableCo. Broidy told Client F that CableCo owned technology in a special kind of cable and had operations and assets. However, as discussed in Section II above, CableCo had no assets and no business operations, which Broidy was aware of due to his board position.

56. Second, Broidy falsely stated on his Form ADV that he did not receive commissions for investments he made on behalf of advisory clients: "[n]either BWA nor its supervised persons accept any compensation for the sale of securities or other investment products . . . ." However, Broidy received occasional stock grants from JetCo in part because of his efforts to raise capital for the company. Additionally, according to an agreement between Broidy and Bandwidth, Broidy would receive a 5% commission on all amounts Broidy solicited for Bandwidth. Broidy solicited multiple investments by his advisory clients during his tenure as a Bandwidth board member.

57. Third, when soliciting investments in CableCo, JetCo, and Bandwidth by advisory clients, Broidy failed to disclose to some of those clients that he was a board member of these companies.

58. In addition to the omissions described above, Broidy failed to disclose Bandwidth's bankruptcy to any of his clients to whom he recommended an investment in Bandwidth.

## FIRST CLAIM FOR RELIEF

### (Violations of Section 17(a) of the Securities Act)
### (Against Both Defendants)

59. The Commission re-alleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 58 of this Complaint.

60. By engaging in the conduct described above, Defendants, in the offer or sale of securities, knowingly, recklessly, or negligently, by the use of means or instruments of transportation or communication in interstate commerce or the mails, directly or indirectly:

    a. Employed devices, schemes, or artifices to defraud;

    b. Obtained money or property by means of untrue statements of material facts, or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c. Engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

61. By engaging in the foregoing conduct, Defendants violated, and unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)
### (Against Both Defendants)

62. The Commission re-alleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 58 of this Complaint.

63. By engaging in the conduct described above, Defendants knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use or means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

    a. Employed devices, schemes, or artifices to defraud;

    b. Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

64. By engaging the foregoing conduct, Defendants violated, and unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b))] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
**(Violations of Section 206(1) and 206(2) of the Advisers Act)**
**(Against Both Defendants)**

65. The Commission re-alleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 58 of this Complaint.

66. By engaging in the conduct described above, Defendants BWA and Broidy, while acting as investment advisers, by use of the means and instrumentalities of interstate commerce and of the mails, directly or indirectly:

    a. employed devices, schemes, or artifices to defraud clients and prospective clients; and

   b.  engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon clients and prospective clients.

67. By engaging in the foregoing conduct, Defendants have violated, and unless restrained and enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter a Final Judgment:

  a. Finding that Defendants violated the securities laws and rules promulgated thereunder as alleged against herein;

  b. Permanently restraining and enjoining Defendants, their agents, servants, employees, attorneys, and all persons in active concert who receive actual notice of the injunction, and each of them from, directly or indirectly, violating or aiding and abetting violations Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)];

  c. Ordering Defendants to disgorge, on a joint and several basis, all ill-gotten gains plus pre-judgment interest thereon, and such other and further amount as the Court may find appropriate;

  d. Ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-

9(e)];

e. Barring Broidy from serving as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Section 21(d) of the Exchange Ac [15 U.S.C. § 78u(d)]; and

f. Granting such other and further relief as this Court may deem just and proper.

Dated: October 27, 2016
New York, New York

Respectfully submitted,

_/s/_____
Andrew M. Calamari
Lara S. Mehraban
Sandeep Satwalekar
Andrew Dean
Lindsay S. Moilanen
Alexander Janghorbani
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

New York Regional Office
200 Vesey Street, Room 400
New York, New York 10281
(212) 336-1100